**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GOL LINHAS AÉREAS INTELIGENTES S.A. SECURITIES LITIGATION | Case No.  1:20-cv-04243-RPK-RER <br><br> CLASS ACTION |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | AMENDED COMPLAINT |

Lead Plaintiff Artur Timotheo ("Lead Plaintiff") and plaintiff Juan Jimenez (together with Lead Plaintiff, "Plaintiffs") individually and on behalf of all others persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GOL Linhas Aéreas Inteligentes S.A. ("GOL" or the "Company"), and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of GOL American Depository Share ("ADS") from February 20, 2020 through July 23, 2020 inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

1

2.      GOL is a Brazilian airline founded in 2000 by Brazilian businessman Constantino de Oliveira Sr. ("Nene Constantino") and his four sons—Defendant Constantino de Oliveira Junior ("de Oliveira Jr."), Ricardo Constantino, Joaquim Constantino and Henrique Constantino (the "Constantino Family").  The Company went public in June 2004.

3.      The Constantino Family is GOL's controlling shareholder.  Members have all held roles at GOL from the Company's inception.

4.      The Constantino Family and its businesses have a history of corruption practices—including bribes to legislators—which compelled the resignation of Henrique Constantino from the Board of Directors of GOL in 2016.  His brother, Defendant Oliveira Jr., though remained Chairman of the Board of Directors of GOL.  It was therefore important that investors be assured that GOL's internal controls protected the Company from improper practices by the Chairman and other Constantino Family members.

5.      In both February 2020 and May 2020—while the world was in the throes of the COVID-19 pandemic, which hit the airline industry especially hard—Defendants issued upbeat statements about GOL's business.

6.      On February 20, 2020, GOL issued its 4Q 2019 Earnings Report.  The Company's CEO, Defendant Kakinoff, touted GOL's 4Q performance as rounding out "an outstanding year in GOL's history."   The Company also boasted about its "healthy margins," "balance sheet strengthening" and "effective balance sheet management."  The Company's CFO, Defendant Lark, added, "[w]e continue to strengthen the Company's equilibrium through disciplined working capital management and capital structure optimization."

7.      GOL continued to assure investors in its 1Q 2020 Earnings Report issued May 4, 2020. Defendant Kakinoff stated, "[w]e are experienced at navigating in times of stress," and

"[o]ur flexible fleet model has always been a differentiating strength for GOL, and we were fast to adapt even when the impact of COVID-19 was still being understood."  The Company continued to tout its "strong cost control and efficient capacity and yield management."  Defendant Lark added, *"[w]e have effective and structured liquidity management. Even in the face of macroeconomic changes, we maintained our liquidity mix, which puts us in a strong position to face this crisis."*

8.     These statements were misleading due to material omissions.  Consistent with Auditing Standard No 1301, at least as early as February 2020 and/or no later than May 3, 2020, GOL's Statutory Audit Committee, consisting of Defendants André Béla Jánszky, Antonio Kandir and Francis James Leahy Meaney, was told by its newly retained outside auditors KPMG International Limited ("KPMG") that  (i) there was a  "substantial doubt" about the company's ability to continue as a "going concern;" (ii) there was a material weakness in internal controls over financial reporting ("ICFR") related to general information technology controls ("GITCs") over operating systems, databases and applications, which had failed to prevent errors in measuring net income  and revenue for its "Smiles" frequent flyer loyalty program; and (iii) there were material weaknesses in ICFR concerning: (a)   identification and disclosure of material uncertainties in GOL's ability to operate as a  going concern; and (b) the ability of the Company's Chairman to initiate and approve transactions.  Defendants were duty bound but failed to disclose these communications and material facts.

9.     It was not until June 2020 that investors first learned of KPMG's communications to Defendants. On June 16, 2020, GOL revealed that KPMG had informed management and its Statutory Audit Committee that the auditor's report for year 2019 will probably; (i) include an

"emphasis paragraph" questioning the Company's ability to continue as a going concern; and (ii) disclose one or more material weaknesses.

10.    On this news, shares of GOL's American Depository Share ("ADS") price fell $0.27 per share or 3.5% to close at $7.30 per share on June 16, 2020.

11.    On June 29, 2019, GOL filed its 2019 20-F, admitting (i) substantial doubts as its ability to operate as a going concern;  (ii) material ICFR weaknesses; and (iii) and the fact that the Company had made material errors concerning Smiles' revenue recognition, which its ICFRs failed to prevent, and consequently were corrected by KPMG.

12.    On this news, shares of GOL's ADS fell $0.14 per share, or 2.02%, to close at $6.78 per share on June 30, 2020.

13.    Indicative of Defendants' prior resistance to timely disclosure of KPMG's substantial doubts as to GOL's going concern status, material ICFR weaknesses and the Smiles net income and revenue error correction by KPMG, on July 6, 2020 (a mere week after KPMG had forced GOL to disclose these matters), KPMG was fired. GOL proceeded to re-hire Ernst & Young ("E&Y"), its auditor from 2014 through 2019, which had consistently found that GOL maintained "effective internal controls over financial reporting."

14.    However, KPMG's firing was not disclosed until two weeks later by a press release issued by GOL on July 23, 2020.

15.    On this news, shares of GOL's ADS fell $0.55 per share, or 7.05%, to close at $7.25 per share on July 23, 2020.

16.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

20.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21.     Plaintiffs, as set forth in the accompanying certification of plaintiff Jimenez and as was set forth in the certification of Lead Plaintiff Timotheo (filed with the Initial Complaint, Case No. 1:20-cv-04644, ECF No. 1) and incorporated by reference herein, purchased or otherwise acquired GOL securities during the Class Period and were economically damaged thereby.

22.     Defendant GOL provides air passenger transportation services in Brazil, the rest of South America, the Caribbean, and the U.S.  GOL is incorporated in the Federative Republic of Brazil ("Brazil") with headquarters in São Paulo, São Paulo, Brazil.  GOL's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "GOL."

23.     Defendant Paulo Sergio Kakinoff ("Kakinoff") served as the Company's Chief Executive Officer throughout the Class Period.

24.      Defendant Richard F. Lark, Jr. ("Lark") served as the Company's Chief Financial Officer throughout the Class Period.

25.      Defendant Constantino de Oliveira Júnior ("de Oliveira Jr.") served as the Company's Chairman of the Board of Directors throughout the Class Period.

26.      Defendant André Béla Jánszky ("Béla Jánszky") served as member of the Company's Board of Directors and as member of the Company's Statutory Audit Committee throughout the Class Period.

27.      Defendant Antonio Kandir ("Kandir") served as member of the Company's Board of Directors and as member of the Company's Statutory Audit Committee throughout the Class Period.

28.      Defendant Francis James Leahy Meaney ("Leahy Meaney ") served as member of the Company's Board of Directors and as member of the Company's Statutory Audit Committee throughout the Class Period.

29.      Defendants Kakinoff, Lark, de Oliveira Jr, Béla Jánszky, Kandir and Leahy Meaney are collectively referred to herein as the "Individual Defendants."

30.      Defendants GOL and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**GOL's Background and The Constantino Family**</u>

31.      GOL was founded by Constantino de Oliveira Sr. ("Nene Constantino") and his four sons.

32.     Nene Constantino is an ex-trucker who started a bus-transport company in the Brazilian state of Minas Gerais in the 1950s, and, by the time of GOL's founding, controlled one of Brazil's largest transportation groups.

33.     GOL was founded in 2001—Brazil's first low-cost airline— as a subsidiary of the Brazilian transportation conglomerate Comporte Partecipações SA.  Comporte Partecipações SA is owned by the Constantino Family, and owns 61% of GOL and its subsidiaries, thus making it the Company's controlling shareholder.

34.     Nene Constantino and his four sons have all held roles at GOL from the Company's inception.  Nene Constantino was the Chairman of the Board of Directors from 2004 to 2008. Henrique Constantino was the Vice-Chairman of GOL from 2010 to 2016 and a director from 2004 to 2016 until he was forced to stepdown amid a bribery scandal, discussed below.  Ricardo Constantino and Joaquim Constantino Neto have been directors of GOL since 2004.  Defendant de Oliveira Jr. was the CEO from 2001 to 2012, has been a member of the Board of Directors since 2001 and became the Chairman of the Board in 2012.

### Overview of Internal Controls Audit Procedures, The Significance of Findings of Material Weaknesses and The Rules Regarding Timing for Communication of Such Findings to Management

### Internal Controls Over Financial Reporting

35.     Internal controls are essential to the integrity and reliability of financial results to investors.  They have three main objectives:  effectiveness and efficiency of operations, reliability of financial reporting and compliance with applicable laws and regulations.

36.     As directed by Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), the SEC implemented rules for the reporting of ICFR, intended to provide reasonable assurance to investors

that financial statements materially comply with the authoritative accounting and reporting standards. These rules are applicable to all companies whose securities are traded in the U.S.

37.     For large companies, such as GOL, SOX requires that independent auditors assess and report on the effectiveness of the company's ICFR in accordance with standards established by the Public Company Accounting Oversight Board ("PCAOB"), a regulatory body created by SOX that provides oversight of independent auditors of US publicly-traded companies.

38.     As defined by the PCAOB Auditing Standard No. 2201, Appendix A, A3, a deficiency in ICFR exists when "the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis."

39.     In turn, as defined by the PACOB Auditing Standard No. 2201 ("AS No. 2201"), Appendix A, A11, a significant deficiency "is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting."

40.     *A "material weakness" is the most serious of all deficiencies*, and, as defined by AS No. 2201, Appendix A, A7, a material weakness "is a deficiency or a combination of deficiencies such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."

41.     As used in AS No. 2201, Appendix A, A7, "a reasonable possibility" is defined as when the event's likelihood is either "reasonably possible" or "probable" as those terms are used in Financial Accounting Standards No. 5 ("FAS 5"), Accounting for Contingencies.

42.     The staffs of the SEC's Office of the Chief Accountant and the Division of Corporation Finance have recognized that *a registrant is obligated to identify and publicly disclose all material weaknesses.*[1]

**Timing of ICFR Audits and Communications**

43.     Auditing a company's prior fiscal year's ICFR commences shortly after the beginning of the following year, in this case January 2020.

44.     At the outset, auditors are most concerned about the reliability of financial reporting, and thus initially focus on the adequacy or weakness of controls designed to prevent and to detect material misstatements in the financial statements. This assessment informs the scope of the audit process, since weaknesses require more probing and less reliance on management's conclusions.

45.     GOL prepares its financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board ("IFRS"). Even though their financial statements are not prepared in accordance with U.S. Generally Accepted Accounting Principles, the federal securities laws require that the audit be conducted in accordance with PCAOB standards.

46.     Particularly relevant to the claims in this case is PCAOB Auditing Standard No. 1301 ("AS No. 1301") which establishes requirements that enhance the relevance and timeliness of the communications between the auditor and the audit committee of the Board of Directors, and is intended to foster constructive dialogue between the two on significant audit and financial statement matters.

---

[1] SEC, "Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports - Frequently Asked Questions," October 6, 2004, p. 3, https://www.sec.gov/info/accountants/controlfaq1004.htm, accessed on January 27, 2020.

47.     Among other things, AS No. 1301 requires auditors to "provide the audit committee with *timely* observations arising from the audit that are significant to the financial reporting process."  (Emphasis supplied.)

48.     AS No. 1301 further states, all audit committee communications required by this standard should be made in *"prior to the issuance of the auditor's report*. The appropriate timing of a particular communication to the audit committee depends on factors such as the significance of the matters to be communicated and corrective or follow-up action needed." (Emphasis supplied.)

49.     In addition, AS No. 1305 states that, "the auditor must communicate in writing to management and the audit committee all significant deficiencies and material weaknesses identified during the audit. The written communication should be made prior to the issuance of the auditor's report on the financial statements."

50.     A "material weakness" (as in this case) is *more* serious than a "significant deficiency", thus increasing the importance of prompt communication from the audit committee.

## Overview of Going Concern Consideration and Materiality Thereof

51.     International Accounting Standards (IAS) No. 1, requires management, to assess the company's ability to continue as a "going concern," *i.e.* has sufficient near-term cash flow to meet debt payments on time and avoid a liquidation in bankruptcy.

52.     Under IAS No. 1, when management becomes aware of *material uncertainties* related to events or conditions that may cast *significant doubt* on the company's ability to continue as a going concern, those uncertainties must be disclosed in the financial statements.

53.     In assessing whether the going concern assumption is appropriate, management takes into account all available information about the future, which is at least, but is not limited to, twelve months from the end of the reporting period.  The degree of consideration depends on the facts of each case and may take into account information that becomes available subsequent to the reporting date (*i.e.* balance sheet date).

54.     Furthermore, management must also make a going concern assessment *each quarter*, if interim financial statements are issued quarterly.

55.     Similarly, an auditor is also required to make a going concern assessment as part of its audit of a company's financial statements.  In contrast to IAS No. 1, which requires management to disclose if it determines that there is a *significant doubt* of the  company's ability to continue as a going concern,  AS No. 2415 requires auditors to disclose a going concern if it determines that there is  *substantial doubt* about the entity's ability to continue as a going concern.

56.     Generally speaking, Management Discussion and Analysis of Financial Conditions and Results of Operations ("MD&A") is a section of a public company's annual  or quarterly filing that addresses the company's performance. In this section, the company's management and executives present an analysis of the company's performance with qualitative and quantitative measures.

57.     Financial statements do not generally take into account the effects of events that occurred subsequent to the end of the reporting period.  However, the MD&A is understood to speak at the time of the filing.  As such, any statements issued by GOL in 2020 regarding 2019 financial results and/or 1Q 2020 results, had to take into account facts known as of the dates those statements were issued.

**Accounting For GOL's Smiles Frequent Flyer Program**

58.     KPMG identified reporting errors and a material weakness in GOL's controls over, among other things, revenue recognition for its Smiles loyalty program.

59.     Loyalty programs involving frequent flyer mileage credits are generally organized as separate legal entities.  They are accounted for as consolidated subsidiaries when, as is usually the case, the airline controls them by holding a majority of the outstanding voting shares, or by some other means. GOL owns 52.61% of its loyalty program subsidiary Smiles Fidelidade SA. The shares of Smiles Fidelidad not owned by GOL are listed on the Brasil Bolsa Balcão.

60.     The Smiles loyalty program allows members to accumulate mileage credits through (i) flights with GOL and transactions with Smiles' commercial partners (*e.g.,* Brazilian commercial banks that issue credit cards, including co-branded cards; retail partners, including car rental agencies,  hotel chains, travel agencies, gas stations, bookstores, media companies, drugstores, restaurants and parking lot operators), direct customer purchases of mileage credits, and purchases of mileage credits and benefits through *Clube Smiles* (Smiles Club).

61.     Relevant aspects of the accounting for mileage credits accrued in the Smiles loyalty program are as follows: (i) for passenger trips, a portion of the cash received for airfare is initially recognized as a liability; (ii) cash received from partners from the sale of mileage credits is also recognized as a liability; (iii) the liability from (i) and (ii) is reduced, and a corresponding amount of revenue is recognized in the period when mileage credits are redeemed for free services (e.g., flights), or upon expiration/"breakage".  "Breakage" refers to mileage credits awarded that are not expected to be redeemed.

### Comporte Partecipações SA and The Constantino Family's History of Illegal Practices

62.     GOL's internal controls to prevent unwarranted intervention in the Company's financial matters was material to investors given the Constantino Family's history of corruption.

63.     In 2013, an investigation by Federal Police in the Federal District of Brasilia targeting public transportation cartels, identified several of the Constantino family's companies, including Comporte Partecipações, of concealing relationships between Constantino family-owned mass-transit companies in order to acquire a larger share of public transportation contracts than is allowed by law.

64.     While no business group is legally permitted to control more than 25% of public bus  concessions in an urban area, the Constantino family was accused of controlling as much as 50% in the Federal District, and seeking to control over 70% in the city of Londrina by bribing politicians and public officials.

65.     The Constantino family companies have also been accused of receiving preferential treatment in transport contracts from Joaquim Roriz, the former Governor of the Federal District and former Senator of Brazil.  This was following revelation of recorded conversations between the President of the Bank of Brazil, Tarcisio Franklin de Moura, and Joaquim Roriz ("Roriz"), in which they discussed sharing a R$2.2 million bribe from Nene Constantino.

66.     In 2015, a Federal District court convicted Roriz and Nene Constantino of administrative improbity (fraud).

67.     Also in 2016, the "Lava Jato" corruption investigation—which focused on construction company kickbacks (including executives of oil and gas giant Petrobras, SA in return for accepting inflated multibillion dollar refinery construction contracts)—expanded to "Operation Sepsis," focusing on inflated highway construction contracts and bribery.

68.     Among the targets of the investigation was another Comporte Partecipações SA subsidiary.  At the time, Henrique Constantino was a director and shareholder of Comporte Partecipações SA, as well as a member of GOL's Board of Directors.

69.     Henrique Constantino was indicted for allegedly paying bribes in exchange for loans from state-owned Caixa Economica Federal bank.  As a result, he resigned from the Board of GOL in July 2016.

70.     In October 21, 2016, GOL announced that it had received earlier that year a request from Brazilian tax authorities (the "2016 irregular payments investigation") in connection with an audit to furnish information regarding certain expenditures made by the Company in 2012 and 2013.  Later that year, GOL agreed to pay to pay a $3.2 million fine and stated that it had engaged independent legal counsel to conduct an investigation.

71.     In December 2016, Deloitte Touche Tohmatsu Auditores Independentes ("Deloitte") agreed to pay $8 million to the PCAOB to settle charges that it knowingly issued materially false audit reports for the 2010 financial statements and internal controls of GOL.  Deloitte issued false audit reports and attempted to cover up GOL's accounting violations by improperly altering documents and providing false testimony to the regulator.

72.     The Deloitte engagement team working on the 2009 GOL audit had concluded that GOL had improperly recorded, and otherwise failed to appropriately track its maintenance deposits for leased aircraft, Deloitte had signed off on the Company's 2009 reported financial results.

73.     In August 2017, Lucio Funaro ("Funaro"), an accomplice of Eduardo Cunha ("Cunha") (former Brazilian Congressional speaker) signed a plea agreement in which he claimed that he was present in meetings in which Henrique Constantino discussed paying bribes to Cunha and others.

74.     Funaro stated that Henrique Constantino told him that he was able to "kill two matters" with his bribes.  *First*, advance legislation to eliminate or reduce the surcharge paid by transportation companies.  *Second*, to favor the Constantino family's bid for bus transportation

14

routes in Brasilia.  Funaro states that Henrique Constantino told him he needed this in order for Comporte Partecipações SA to survive.

75.     In April 2019, Henrique Constantino signed a plea agreement admitting to illicit cash transfers to companies owned by Eduardo Cunha in exchange for favorable treatment of Constantino family companies, including GOL, and to other bribes at issue in "Operation Sepsis."

76.     On February 3, 2021 it was announced that on that day the Public Ministry of the Federal District and Territories carried out search and seizure warrants against a bribery scheme to lower taxes on aviation fuels in the Federal Capital in connection with the claims made by Funaro in his August 2017 plea agreement.  According to the investigation, the crimes occurred between 2012 and 2014 and there are indications that GOL and LATAM Airlines paid R$4 million to ex-vice governor of the Federal District Tadeu Filippelli and R$10 million to Cunha.

77.     The investigation was named "Operation Antonova."   According to the investigation, there was a bribe made by GOL's Henrique Constantino, with the aim of changing a district law to reduce the tax from 25% to 12%.    GOL said that it collaborated with the authorities.

### Prior   to the Class Period, GOL Assured Investors That Its Internal Controls Had Been Strengthened

78.     Given this history, it was important that GOL impress its remediation efforts on its investors. In its 2016 20-F, (filed May 1, 2017) GOL also announced that during 2016 it had  taken "*steps to strengthen and expand our internal control and compliance program*. . .we commenced monitoring our transactions with politically exposed persons, and we enhanced our procurement procedures and the procedures for the contracting and execution of services by outside providers." (Emphasis supplied.)

79.     GOL went on to state that it had taken "a number of steps in 2016, to strengthen our internal controls and our compliance procedures, including, among others (1) enhancing rules for procurement directly by senior executive officers, (2) monitoring transactions with politically exposed persons; (3) reviewing exceptions to the procurement policy; (4) reviewing our policy for purchases effected outside our procurement policy; (5) reviewing the rules regarding sole-source suppliers; and (6) increased formalization to record services provided to us. We will continue to further improve our internal controls and compliance programs."

80.     In its 2018 20-F, (filed March 13, 2019) GOL touted its internal controls program. The Company stated that since 2016 it had taken several steps to strengthen and expand its internal controls and compliance program, which included:  hiring specialized companies to evaluate risks and review internal controls related to fraud and corruption; integrating the risks functions, compliance and internal controls in the executive committee for corporate risks, compliance and internal controls, which reports directly to their chief executive officer, and has independent access to their board of directors and statutory audit committee, monitoring transactions involving politically exposed persons and improving their supervision procedures of the execution of services hired from third parties.

81.     GOL added, "Our senior management has been constantly reinforcing our commitment towards improvement of our internal control and compliance programs to our employees, customers and suppliers."

## THE FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### On February 20, 2020 GOL Issues Its Earnings Report For 4Q 2019

82.     On February 20, 2020 GOL announced results for 4Q 2019.  Touting its successful prior year, "Defendant Kakinoff said, "[o]ur record revenues this quarter rounds out what has been

16

an outstanding year in GOL's history." Adding, "[i]t's testament to our team delivering exceptional customer experience, combined with GOL's low-cost operating model and sophisticated fleet management, that are powering our growth, in both domestic and international markets."

83.    In the MD&A, the Company also touted its "effective balance sheet management," pointing to "operating cash flow generation around R$1.0 billion in the quarter."  Despite the onset of the COVID-19 pandemic, the Company assured investors that the future looked bright. "Currently, trends in revenue and passenger bookings remain strong, and the Company expects the first quarter RASK to increase by 4% to 6%, compared to 1Q19."

84.    Also in the MD&A Defendant Lark added, "[w]e continue to strengthen the Company's equilibrium through disciplined working capital management and capital structure optimization." "We are, and will continue to be, an even stronger Company."

85.    With respect to net income for 4Q 2019, GOL reported a net income of R$344.7. of which more than half (R$179.5) was attributable to Smiles.

86.    The statements contained in ¶¶82-85 were materially misleading because they failed to disclose that consistent with its auditing responsibilities and PCAOB AS No. 1301 and AS No. 2415, KPMG had advised GOL's Statutory Committee and others that:  (i) there was a "substantial doubt" about the company's ability to continue as a "going concern;" (ii) there was a material weakness in internal controls over financial reporting ("ICFR") related to general information technology controls ("GITCs") over operating systems, databases and applications, which had failed to prevent errors in measuring net income  and revenue for its "Smiles" frequent flyer loyalty program; and (iii) there were material weaknesses in ICFR concerning: (a) identification and disclosure of material uncertainties in GOL's ability to operate as a  going

concern; (b) the ability of the Company's Chairman to initiate and approve transactions. Defendants were duty bound but failed to disclose these communications and material facts.

**On May 4, 2020 GOL Issues Its Earnings Report For 1Q 2020**

87.    On May 4, 2020, GOL announced results for 1Q 2020.  The Company emphasized how well it was managing its liquidity.  Defendant Kakinoff stated, "[w]e are experienced at navigating in times of stress."  Adding, "[b]y acting with speed and decisiveness, we have reduced our fixed costs to preserve the jobs of our Employees and the Company's working capital in the short term. This will provide us with the necessary liquidity to weather the storm."

88.    In the MD&A, Defendant Lark added, "[w]e have effective and structured liquidity management. Even in the face of macroeconomic changes, we maintained our liquidity mix, which puts us in a strong position to face this crisis."

89.    While the GOL reported a sizable loss for the 1Q20, it nonetheless reported a profit of R$56.3 for Smiles.

90.    The statements contained in ¶¶87-89 were materially misleading because they failed to disclose that consistent with its auditing responsibilities and PCAOB AS No. 1301 and AS No. 2415, KPMG had advised GOL's Statutory Committee and others that:  (i) there was a "substantial doubt" about the company's ability to continue as a "going concern;" (ii) there was a material weakness in internal controls over financial reporting ("ICFR") related to general information technology controls ("GITCs") over operating systems, databases and applications, which had failed to prevent errors in measuring net income  and revenue for its "Smiles" frequent flyer loyalty program; and (iii) there were material weaknesses in ICFR concerning: (a) identification and disclosure of material uncertainties in GOL's ability to operate as a  going

concern; (b) the ability of the Company's Chairman to initiate and approve transactions. Defendants were duty bound but failed to disclose these communications and material facts.

### The Truth Begins To Emerge

91.     On June 16, 2020, while  announcing a further delay in filing  its Annual Report for 2019, GOL surprised investors by disclosing that KPMG had informed management and the audit committee that:  (i) its report on the Company's "internal control over financial reporting as of December 31, 2019 will probably include one or more material weaknesses" and (ii) its report on the Company's "consolidated financial statements as of and for the year ended December 31, 2019 will probably include an emphasis paragraph regarding the [Company's] ability to continue as a going concern."

92.     On this news, GOL's ADS price fell $0.27 per share or 3.5% to close at $7.30 per share on June 16, 2020.

93.     On June 29, 2020, after the market closed, GOL filed Form 20-F with the SEC (the "2019 20-F").   Therein, GOL disclosed that (i) there was a  "substantial doubt" about the company's ability to continue as a "going concern;" (ii) there was a material weakness in internal controls over financial reporting ("ICFR") related to general information technology controls ("GITCs") over operating systems, databases and applications, which had failed to prevent errors in measuring net income  and revenue for its "Smiles" frequent flyer loyalty program; and (iii) there were material weaknesses in ICFR concerning: (a)  identification and disclosure of material uncertainties in GOL's ability to operate as a  going concern; (b) the ability of the Company's Chairman to initiate and approve transactions.  Defendants were duty bound but failed to disclose these communications and material facts.

94.     Note 1 to KPMG's Independent Report included in the 20-F detailed the previously undisclosed "substantial doubts" regarding the company's ability to continue operating as a going concern.  It stated in relevant part,

> The Company has a negative net working capital and has a net capital deficiency that raise substantial doubts about its ability to continue as a going concern. . . Considering the unpredictability of the economic crisis triggered by the COVID-19 pandemic and its impacts, Management concluded that there are substantial doubts related to the Company's ability to continue operating, but that the assumption of continuity is still valid, . . . If the Company cannot continue as a going concern, adjustments to the carrying values and classification of our assets and liabilities and the reported amounts of income and expenses could be required and could be material.

95.     GOL disclosed material weakness in ICFR, in relevant part, as follows:

a.   "material weakness related to our general information technology controls, or GITC, over operating systems, databases and applications. . . [t]hese deficiencies also affected the effectiveness of business process automated controls, manual controls with an automated component and the database of the reports that were used to execute some automated and manual controls."

b.   "material weakness in our control environment related to authorizations and administrative functions granted to the chairman of the board included the ability to initiate and approve certain transactions . . . and, if used inappropriately, those authorizations and administrative functions could have had a material effect on GOL's consolidated financial statements."

c.   "material weakness in our control environment related to ineffective policies and procedures over the preparation and review of our consolidated financial statements. Specifically, the Company did not have (i) effective policies and procedures related to the identification and disclosure of material uncertainties in the going concern analysis;

(ii) effective review of financial statement information, and related presentation and disclosure requirements."

96.     GOL also added, *"[t]hese control deficiencies resulted in material misstatements that were corrected in the 2019 consolidated financial statements.* Furthermore, the control deficiencies described above created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis." (Emphasis supplied.)  These material misstatements concerned the Smiles loyalty program.

97.     On this news, GOL's ADS price fell $0.14 per share, or 2.02%, to close at $6.78 per share on June 30, 2020.

98.     On July 6, 2020, less than a week after KPMG blew the whistle on GOL, compelling the Company to make these admissions, GOL's Statutory Audit Committee fired the auditors.

99.     On this news, GOL's ADS price fell $0.55 per share, or 7.05%, to close at $7.25 per share on July 23, 2020.

## SCIENTER ALLEGATIONS

### By the Time It Issued Its Earnings Reports For 4Q 2019 and 1Q 2020, GOL Knew of The Going Concern Problem and the Material Weaknesses

100.     SOX requires independent auditors, like KPMG, to assess and report on the effectiveness of the company's ICFR.  AS No. 2415 requires KPMG to determine if there is *substantial doubt* about GOL's ability to continue as a going concern.

101.     AS No. 1301 requires KPMG to provide GOL's Statutory Audit Committee with timely observations arising from the audit that are *significant* to the financial reporting process—these include disclosures of *substantial doubt* about ability to continue as a going concern and material weaknesses.

102.   An auditor like KPMG was most concerned about the risk of material misstatements.  Accordingly, its audit, which, in line with standard operating procedures began no later than January 2020 (especially because KPMG was engaged in May 2019)—concentrated at the outset on the Company's controls for preventing material misstatements in the financial statements.

103.   These are precisely the controls KPMG deemed were *not* effective at GOL: controls related to authorizations and administrative functions granted to the Chairman of the Board, policies and procedures over the preparation and review of the Company's consolidated financial statement and identification and disclosure of material uncertainties in the going concern analysis.

104.   Furthermore, because significant deficiencies and materials weaknesses—which are more consequential than significant deficiencies—had to communicated in a timely manner and in writing (AS No. 1305), KPMG informed GOL in writing and very early on in the audit process of the three material weaknesses.

105.   Accordingly, consistent with AS No. 1301,  KPMG was compelled  to inform GOL's Statutory Audit Committee and GOL personnel the material ICFR weaknesses revealed *at the outset* of the year-end 2019 audit process, as well as the Company's need to disclose substantial doubt as to its ability to continue as a going concern.

106.   As a result, GOL learned of its ineffective ICFR, the three material weaknesses and the going concern problem at least as early as February 2020 and/or no later than May 3, 2020.

**Avianca, Another Latin American Airline Also Audited by KPMG Disclosed a
Going Concern Emphasis on April 2020**

107.   On April 23, 2020, weeks before GOL issued its misleading May 4, 2020 1Q 2020 statements, Aerovias del Continente Americano S.A. ("Avianca"), a Colombia airline whose

auditor is also KPMG, filed a Form 6-K, stating that, KPMG S.A.S. ("KPMG"), had informed its audit committee that, KPMG's report for Avianca's year end 2019 would "include an explanatory paragraph indicating that substantial doubt exists as to our ability to continue as a going concern."

108.    Unlike GOL, Avianca did not fire KPMG as a result of the auditor's going concern emphasis.

### The Fact that One of the Material Weaknesses Related Directly to Controls Granted to Defendant de Oliveira Jr.'s Supports His Scienter

109.    As discussed, one of the material weaknesses concerned controls surrounding the ability of Defendant de Oliveira Jr., the Chairman of the Board, to initiate and approve transactions.

110.    These controls were intended to prevent Defendant de Oliveira Jr.'s meddling in the Company.

111.    Defendant de Oliveira Jr. knew that there were material weaknesses concerning these specific controls because:  (i) they directly affected what he was capable of doing; and (ii) he was bypassing these restrictions, which is what caused KPMG to identify the material weakness at issue.

112.    Defendant de Oliveira knew that he could skirt around controls limitations, much like Henrique Constantino had done in the past.

113.    As discussed, ¶¶62-77 GOL's controlling shareholder, the Constantino Family, has a history of corruption and bribery charges and more at issue, the Company has a history of ineffective ICFR.

114.    The controls limitations, which GOL purported to have strengthen in 2016, were material to investors given GOL's prior history.

**GOL's Firing Of KPMG Further Supports Scienter**

115.    GOL had *just* hired KPMG in May 2019 and it decided to terminate the auditor in July 6, 2020—a mere week after it issued its 2019 20-F announcing the ineffective ICFR, the material weaknesses, the material misstatements and the going concern problem determined by KPMG.

116.    Prior to KPMG, GOL's auditor had been E&Y and GOL maintained E&Y as its auditor for five years.  Prior to that, GOL's auditor was Deloitte, also for five years.  GOL did not have a practice of rotating auditors on a yearly basis prior to firing KPMG.  Nor was GOL obligated to by the CVM, the Brazilian Securities and Exchange Commission.

117.    In fact, CVM Instruction No. 509/2011 permits companies that install and maintain a Statutory Audit Committee (unlike a regular audit committee)—which GOL has, to hire an independent auditor to provide audit services *for up to ten consecutive years.*

118.    As discussed in ¶¶71-72, GOL forced Deloitte sign off on GOL's improper write-down of unsupported deposits from prior periods.  This caused Deloitte to be fined by the PCOAB.

119.    KPMG, not wanting to share the fate of a predecessor, blew the whistle on GOL and the Company retaliated by firing KPMG and rehiring E&Y, its auditor from 2014 through 2019, which had stated every year that GOL maintained "effective internal controls over financial reporting."

**Smiles Over-Reported Key Financial Metrics and GOL Over-Reported Net Income**

120.    In the course of its audit, KPMG determined that as result of the material weakness related to GITCs, GOL did not have adequate internal controls over recognition from Smiles program mileage credits.

24

121.    As a result, GOL under-recognized its liability for Smiles loyalty points and over-recognized revenue.  The error was corrected prior to the issuance of the financial statements for 2019; however, no corrections were made to prior years presented in the 20-F filing.

122.    As discussed in ¶¶100-06, KPMG discovered the material weakness related to GITCs very early in its audit process, which began no later than January 2020 (especially since KPMG was hired in May 2019).  And, also as discussed in ¶¶100-06, would have informed GOL in a timely manner and in writing.

123.    Accordingly, based on standard operating procedures, GOL learned of the accounting problem related to Smiles at least as early as February 2020 and/or no later than May 3, 2020.

124.    Although it was aware that material weaknesses in ICFR existed, GOL did not disclose them in the 4Q 2019 and 1Q 2020 reports.  GOL also did not correct the material weakness related to GITCs, which would have been relevant information for assessing the reliability of said reports.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

125.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired GOL securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of GOL, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

126.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GOL securities were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

127.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

129.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business GOL;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants caused GOL to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings;

- whether the prices of GOL securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

130.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

131.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- GOL ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- As a public issuer, GOL filed periodic public reports with the SEC and NYSE;

- GOL regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- GOL was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

132.    Based on the foregoing, the market for GOL securities promptly digested current information regarding GOL from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

133.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## **COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

134.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

135.    Defendants Kakinoff and Lark:

(a)    directly participated in the management of the Company;

(b)    were directly involved in the day-to-day operations of the Company at the highest levels;

(c)    were privy to confidential proprietary information concerning the Company and its business and operations;

28

(d)  were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)  were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)  were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)  approved or ratified these statements in violation of the federal securities laws.

136.  Defendants Béla Jánszky, Antonio Kandir and Francis James Leahy Meaney:

(a)  were members of GOL's Board of Directors;

(b)  were members of GOL's Statutory Audit Committee;

(c)  received timely communications from KPMG concerning the auditor's audit of GOL's 2019 year-end financial statements and ICFR.

(d)  received timely communications from KPMG concerning the going concern emphasis and the material weaknesses at issue;

(e)  provided assistance to GOL's Board of Directors on matters involving internal controls and financial reporting;

(f)  evaluated the effectiveness of internal controls.

137.  Defendant de Oliveira Jr.:

(a)  was the Chairman of the Board of Directors;

(b)    received communications from the Statutory Audit Committee concerning the findings by KPMG of a going concern emphasis and the material weaknesses at issue;

(c)    had oversight of the Company's management's evaluation of the effectiveness of GOL's ICFR.

138.    GOL is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

139.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to GOL under *respondeat superior* and agency principles.

140.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of GOL securities during the Class Period.

143.  Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GOL were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of GOL, their control over, and/or receipt and/or modification of GOL's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GOL, participated in the fraudulent scheme alleged herein.

144.  The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GOL personnel to members of the investing public, including Plaintiff and the Class.

145.  As a result of the foregoing, the market price of GOL securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of GOL securities during the Class Period in purchasing GOL securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

146.     Had Plaintiffs and the other members of the Class been aware that the market price of GOL securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased GOL securities at the artificially inflated prices that they did, or at all.

147.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

148.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of GOL securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

149.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

150.     During the Class Period, the Individual Defendants participated in the operation and management of GOL, and conducted and participated, directly and indirectly, in the conduct of GOL's business affairs.  Because of their senior positions, they knew the adverse non-public information about GOL's misstatement of revenue and profit and false financial statements.

151.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GOL's financial condition and results of operations, and to correct promptly any public statements issued by GOL which had become materially false or misleading.

152.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GOL disseminated in the marketplace during the Class Period concerning GOL's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GOL to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of GOL within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GOL securities.

153.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GOL.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of Plaintiffs and the Class, pray for judgment and relief as follows:

A.    Declaring this action to be a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.    Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 8, 2021                                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Marc I. Gross
Veronica V. Montenegro
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mig@pomlaw.com
vvmontenegro@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Attorneys for Plaintiffs***

Friday, February 12, 2021

## GOL Linhas  (GOL)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against GOL Linhas Aéreas Inteligentes S.A. ("GOL Linhas" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire GOL Linhas securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired GOL Linhas securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in GOL Linhas securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Name**

**Print Name**
Juan Jimenez

**Signature**

1

**Acquisitions**

## Configurable list (if none enter none)

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 07/09/20 | 3700 | 7.5986 |
| 07/15/20 | 3700 | 7.885 |
| 07/16/20 | 80 | 7.995 |
| 07/17/20 | 3700 | 7.8295 |
| 07/21/20 | 3815 | 7.817 |
| 07/27/20 | 3800 | 7.12 |
| 07/30/20 | 3200 | 7.085 |
| 08/07/20 | 5970 | 6.71 |
| 11/05/20 | 300 | 5.9384 |

**Sales**

## Configurable list (if none enter none)

| Date Sold | Number of Shares Sold | Price per Share Sold |
|---|---|---|
| 07/15/20 | 3700 | 7.9323 |
| 07/17/20 | 3780 | 7.7705 |
| 07/21/20 | 3700 | 7.9548 |
| 08/10/20 | 10815 | 6.6851 |
| 08/11/20 | 5970 | 6.80 |
| 11/06/20 | 300 | 6.317 |

