UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GOL LINHAS AÉREAS INTELIGENTES S.A. SECURITIES LITIGATION | Case No.  1:20-cv-04243-RPK-RER<br><br>**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>** |

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................................... 4

    A.  GOL's Background and its Controlling Shareholder—the Constantino Family ... 4

    B.  ICFR Are Essential To The Integrity and Reliability of Financial Results to Investors ................................................................................................................. 5

    C.  ICFR Weaknesses Were Material to GOL's Investors Given The Constantino Family's History of Illegal Practices ..................................................................... 5

    D.  Assessment of a Company's "Going Concern" ...................................................... 6

    E.  Consistent With Auditing Standard No. 1301, GOL's Statutory Audit Committee Was Told of the Material Weaknesses in ICFR and the "Going Concern" Qualification as Early as February and Certainly No Later than May 2020—Much Earlier Than When Disclosed by Defendants .................................. 7

        1.  Overview of Auditing Standards and Timing ............................................ 7

        2.  KPMG Informed GOL of The Material Weaknesses and the Going Concern Early as February and Certainly No Later than May 2020 ......... 8

    F.  Defendants Issued Misleading Statements During The Class Period .................... 9

    G.  Disclosure of GOL's Fraud Caused its ADS Price to Fall, Damaging Investors .. 9

    H.  GOL Fires KPMG After the Ineffective ICFR and the "Going Concern" Qualification are Disclosed, Causing its ADS Price to Fall, Damaging Investors .................................................................................. 10

III.  STANDARD ON MOTION TO DISMISS .................................................... 11

IV.  ARGUMENT: DEFENDANTS ISSUED MISLEADING STATEMENTS .................. 11

    A.  Statements Assuring Investors About GOL's Financial Strength Were Rendered Misleading Due To Their Failure To Disclose The "Going Concern" Qualification And The Three Material Weaknesses ......................................... 11

        1.  Going Concern Qualification ................................................................. 12

        2.  Material Weaknesses ............................................................................. 16

        3.  The Statements Are Not Inactionable Puffery ....................................... 17

i

4.      The Statements Are Neither Forward-Looking Nor Statements
of Opinion ...................................................................................... 20

V.      ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER .......... 22

VI.     ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS
CAUSATION ..................................................................................................... 27

VII.    ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED SECONDARY
VIOLATIONS ..................................................................................................... 29

VIII.   CONCLUSION ................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson* v. *Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016), *as amended* (July 6, 2016) ....................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................................11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................................11

*Berger* v. *Beletic*,
248 F. Supp. 2d 597 (N.D. Tex. 2003) ......................................................................................12

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................................................................19

*Caiola v. Citibank, N.A., N.Y.*,
295 F.3d 312 (2d Cir. 2002) ......................................................................................................15

*Carlson v. Xerox Corp.*,
392 F. Supp. 2d 267 (D. Conn. 2005) .......................................................................................25

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17 Civ. 10014,
2019 U.S. Dist. LEXIS 26962 (S.D.N.Y. Feb. 19, 2019) ........................................................23

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006) .......................................................................................28

*De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969 (KM) (JBC),
2018 U.S. Dist. LEXIS 217963 (D.N.J. Dec. 31, 2018) ..........................................................13

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................................................27

*ECA Loc. 134 IBEW Jt. Pension Tr. of Chicago*,
553 F.3d 187, 198 (2d Cir. 2009) .............................................................................................22

*Edgar* v. *Anadarko Petroleum Corp.*, No. H-17-1372,
2019 U.S. Dist. LEXIS 39977 (S.D. Tex. Mar. 13, 2019) ......................................................23

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
783 F.3d 395 (2d Cir. 2015) ......................................................................................................27

*Francisco* v. *Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)................................................................................19

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................27

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002)..............................................................................................21

*Hammer v. Frontier Fin. Corp.*, No. C10-0643,
2011 U.S. Dist. LEXIS 169245 (W.D. Wash. Sep. 7, 2011) ...........................................13

*Hessefort v. Super Micro Comput., Inc.*, No. 18-cv-00838-JST,
2021 U.S. Dist. LEXIS 63629 (N.D. Cal. Mar. 29, 2021)................................................25

*Higginbotham* v. *Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ............................................................................................16

*Howard v. Liquidity Servs.*,
177 F. Supp. 3d 289 (D.D.C. 2016) ..................................................................................28

*In re Alstom SA Sec. Litig.*,
454 F. Supp. 2d 187 (S.D.N.Y. 2006)...............................................................................25

*In re Barrick Gold Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)...............................................................................21

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)............................................................................................13

*In re Carter-Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000).................................................................................................22

*In re CDNow, Inc. Sec. Litig.*,
138 F. Supp. 2d 624 (E.D. Pa. 2001) ................................................................................12

*In re Computer Scis. Corp. Sec. Litig.*,
890 F. Supp. 2d 650 (E.D. Va. 2012) ...............................................................................23

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)..................................................................................20

*In re Dell Inc. Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)..............................................................................26

*In re Ebix, Inc. Sec. Litig.*,
898 F. Supp. 2d 1325 (N.D. Ga. 2012) .............................................................................17

iv

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010)..................................................................28

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, and ERISA Litig.*,
    898 F. Supp. 2d 176 (D.D.C. 2012) ....................................................................27

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)...........................................................18, 28

*In re Leham Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)..................................................................22

*In re Level 3 Communs. Sec. Litig.*,
    667 F.3d 1131 (10th Cir. 2012) ...........................................................................18

*In re MCI Worldcom, Inc. Sec. Litig.*,
    191 F. Supp. 2d 778 (S.D. Miss. 2002)................................................................19

*In re MF Global Holdings*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................21

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).................................................................................11

*In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165,
    2006 U.S. Dist. LEXIS 90854 (E.D.La. Dec. 14, 2006)......................................24

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .............................................................................18

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...................................................................................11

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018)...................................18

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018)..................................................................21

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)......................................................................... *passim*

*In re Vivendi Universal S.A Litig.*,
    381 F. Supp. 2d. 158 (S.D.N.Y. 2003).................................................................13

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009)..................................................................29

*Johnson* v. *Siemens AG*, No. 09-cv-5310 (JG) (RER),
   2011 U.S. Dist. LEXIS 35000 (E.D.N.Y. Mar. 31, 2011) .......................................................23

*King Cnty. v. IKB Deutsche Industriebank AG*,
   708 F. Supp. 2d 334 (S.D.N.Y. 2010)...................................................................................29

*Kleinman v. Elan Corp.*,
   *plc*, 706 F.3d 145, 153 (2d Cir. 2013)..................................................................................19

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)...................................................................................19

*Lasker* v. *N.Y. Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996).....................................................................................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).................................................................................................29

*Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA,
   2017 U.S. Dist. LEXIS 75262 (N.D. Cal. May 17, 2017) .....................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)......................................................12

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)..................................................................................................11

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999).....................................................................................21

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
   929 F. Supp. 2d 740 (M.D. Tenn. 2013)................................................................................25

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................................11, 24

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)....................................................................................................19

*Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund v. Conseco, Inc.,* No. 09-cv-6966,
   2011 LEXIS 34241, at *21 (S.D.N.Y. Mar. 30, 2011) ..........................................................24

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..............................................................................................19

*Pollio* v. *MF Glob., Ltd.*,
   608 F. Supp. 2d 564 (S.D.N.Y. 2009)....................................................................................23

*Richman* v. *Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)................................................................................29

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996).................................................................................................14

*SEC v. Merch. Cap. LLC*,
    483 F.3d 747 (11th Cir. 2007) ...........................................................................................13

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)...............................................................................................20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)......................................................................................................22, 23

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...............................................................................................22

*Westchester Teamsters Pension Fund* v. *UBS AG*,
    604 F. App'x 5 (2d Cir. 2015) ...........................................................................................24

*Wilder v. News Corp.*,
    2015 U.S. Dist. LEXIS 137158 (S.D.N.Y. Oct. 6, 2015) ..................................................29

## Statutes

15 U.S.C. § 78u.....................................................................................................................11

Sarbanes-Oxley Act of 2002 Section 404................................................................................5

## Rules

Fed. R. Civ. P. 9(b) ..............................................................................................................11

## I.    PRELIMINARY STATEMENT

This is a federal securities class action on behalf of purchasers of GOL Linhas Aéreas Inteligentes S.A. ("GOL" or the "Company") American Depository Share ("ADS") from February 20, 2020 through July 23, 2020 inclusive (the "Class Period"), asserting violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Defendants are GOL, Paulo Sergio Kakinoff ("Kakinoff"), the Company's CEO, Richard F. Lark, Jr. ("Lark"), the Company's CFO, the Company's Chairman of the Board of Directors and members of the Company's Statutory Audit Committee.[1]

During the Class Period, while the world was in the throes of the COVID-19 pandemic, which hit the airline industry especially hard—Defendants issued upbeat statements about GOL's liquidity. In the 4Q 2019 Earnings Report, issued February 20, 2020, Defendants touted GOL's performance as rounding out "an outstanding year in GOL's history," and boasted about its "healthy margins," "balance sheet strengthening" and "effective balance sheet management." In the 1Q 2020 Earnings Report, issued May 3, 2020, Defendants continued to tout GOL's "strong cost control and efficient capacity and yield management," and stated, *"[w]e have effective and structured liquidity management. Even in the face of macroeconomic changes, we maintained our liquidity mix, which puts us in a strong position to face this crisis."*

---

[1] Plaintiffs are still in the process of serving the Newly Added Defendants—Messrs. Constantino de Oliveira Júnior (de Oliveira Jr.) the Chairman of the Board and André Béla Jánszky, Antonio Kandir and Francis James Leahy Meaney, members of GOL's Statutory Audit Committee. Plaintiffs are currently in the process of serving the Newly Added Defendants via the Hague Convention, but it has taken longer than expected due to delays resulting from the COVID-19 pandemic and the complexity of the service process in Brazil. Pursuant to its declarations to the Hague Convention, Brazil permits service in its country only via the Brazilian government, effected by submitting a Hague Service Request to the Brazilian Central Authority located within the Ministry of Justice and Public Security in Brasilia. The Brazilian authorities prefer to receive requests for service signed by the forum court judge rather than by attorneys or others authorized by the rules of the court. Though a request for signature was filed with this Court (ECF No. 26), the Court did not agree to sign the Hague Requests. We are therefore proceeding to effect service with Hague Requests signed by Veronica V. Montenegro with an apostille from a New York county office. The waiting period for that can amount to weeks. After receiving the apostille, it is sent—along with the signed Hague Requests— to the international process server, to effectuate service. We are in the process of awaiting the apostille.

In truth, these statements were misleading due to material omissions. Consistent with Auditing Standard No. 1301 ("AS No. 1301"), at least as early as February 2020 and certainly no later than May 3, 2020, GOL's Statutory Audit Committee was told by its newly retained outside auditors KPMG International Limited ("KPMG") that there was a "substantial doubt" about the company's ability to continue as a "going concern"—meaning, that there was significant risk that GOL lacked near-term cash flow to meet debt payments on time and avoid a liquidation in bankruptcy. The auditors also advised that were material weaknesses in internal controls over financial reporting ("ICFR") related to general information technology controls ("GITCs") which had failed to prevent errors in measuring net income and revenue for GOL's "Smiles" frequent flyer loyalty program. There were also material weaknesses in ICFR concerning: (a) identification and disclosure of material uncertainties in GOL's ability to operate as a going concern; and (b) the ability of the Company's Chairman, de Oliveira Jr., to initiate and approve transactions. Defendants were duty bound, but failed to disclose these communications and material facts. Despite being so advised, Defendants issued unqualified upbeat statements about the Company's business and liquidity, while concealing KPMG's clearly communicated liquidity concerns and material weaknesses.

On June 2020—when Defendants finally disclosed KPMG's liquidity concerns and the material weaknesses, shares of GOL's ADS dropped $0.27 per share or 3.5% to close at $7.30 per share on June 16, 2020 and fell $0.14 per share, or 2.02%, to close at $6.78 per share on June 30, 2020. Indicative of Defendants' prior resistance to timely disclosure of KPMG's substantial doubts as to GOL's "going concern" status and the material weaknesses, KPMG was fired one week later. When the firing was announced on July 23, 2021, GOL's ADS fell $0.55 per share, or 7.05%, to close at $7.25 per share.

2

Defendants' motion to dismiss the Amended Complaint should be denied. *First,* Defendants' statements assuring investors about GOL's financial strength were rendered misleading due to their failure to disclose KPMG's "going concern" qualification and the material internal control weaknesses. KPGM had informed Defendants about its observations early in its audit process—by February 2020 and certainly no later than May 2020. Accordingly, if Defendants chose to speak about the strength of the Company they had "a duty to tell the whole truth," namely KPMG's observations concerning the "going concern" and material weaknesses. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). The "going concern" was material to investors because investors care about a company's ability to pay its debt as it becomes due. Moreover, given the Constantino Family's history of corrupt practices, the Company's prior material weaknesses and its assurances to investors that GOL had taken steps to strengthen its internal controls, these observations were also material. Especially so, the material weakness concerning the ability of Defendant de Oliveira Jr. to initiate and approve transactions. The misleading statements are neither puffery nor corporate optimism—they were made repeatedly and were specific and reassuring.

*Second*, based on the normal process of how audits are conducted, i.e., *how* and *when* auditors communicate with a company and *what* they communicate to the company during their audit, the Amended Complaint plausibly alleges that GOL's Statutory Audit Committee and officers were told about the "going concern" qualification and the material weaknesses as early as February 2020 and certainly no later than May 2020. Therefore, the Amended Complaint alleges particularized facts evidencing that Defendants' public statements were inconsistent with their private knowledge. Scienter is further evidenced by (i) GOL's abrupt termination of KPMG on July 6, 2020—a mere week after issuance of the 2019 20-F with the "going concern" and material

3

weaknesses disclosures—and only six months after KPMG started its first audit process for the Company, and, (ii) the fact that Aerovias del Continente Americano S.A. ("Avianca"), a competitor of GOL, also audited by KPMG, disclosed a "going concern" *two months* before GOL did and never fired its auditor.

*Finally,* the Amended Complaint also adequately pleads loss causation. The "going concern" qualification and the material weaknesses—uncovered by the KPMG's audit, plausibly revealed to the market GOL's liquidity problems. When GOL finally acknowledged these—well after its stock price had fallen due to the COVID-19 pandemic—GOL's stock price fell significantly further based on just that alone. For these reasons, and others discussed below, Defendants' motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    GOL's Background and its Controlling Shareholder—the Constantino Family

GOL was founded by in 2001 by Constantino de Oliveira Sr. ("Nene Constantino") and his four sons. ¶[2] 31. GOL is a subsidiary of conglomerate Comporte Partecipações SA, which is owned by the Constantino Family, and owns 61% of GOL and its subsidiaries. ¶ 33.

Nene Constantino and his four sons have all held roles at GOL from the Company's inception. ¶ 34. For example, Henrique Constantino was the Vice-Chairman of GOL from 2010 to 2016 and a director from 2004 to 2016 until he was forced to stepdown amid a bribery scandal. *Id.* Defendant de Oliveira Jr. was the CEO from 2001 to 2012, has been a member of the Board of Directors since 2001 and became the Chairman of the Board in 2012. *Id.*

---

[2] Citations to "¶___" are to the Amended Complaint (ECF No. 12).

**B.    ICFR Are Essential To The Integrity and Reliability of Financial Results to Investors**

Internal controls are essential to the integrity and reliability of financial results to investors. ¶ 35.  They have three main objectives:  effectiveness and efficiency of operations, reliability of financial reporting and compliance with applicable laws and regulations.  *Id*.  Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), the SEC implemented rules for the reporting of ICFR, intended to provide reasonable assurance to investors that financial statements materially comply with the authoritative accounting and reporting standards.  ¶ 36.  For large companies, such as GOL, SOX requires that independent auditors assess and report on the effectiveness of the company's ICFR in accordance with standards established by the Public Company Accounting Oversight Board ("PCAOB"), a regulatory body created by SOX that provides oversight of independent auditors of US publicly-traded companies.  ¶ 37

Auditing Standard No. 2201 ("AS No. 2201"), defines the different levels of deficiencies that could be present in the ICFR.  ¶¶ 38-39.  *A "material weakness" is the most serious of all deficiencies*, and, is defined as a deficiency or a combination of deficiencies such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.  ¶ 40.  The staffs of the SEC's Office of the Chief Accountant and the Division of Corporation Finance have recognized that *a registrant is obligated to identify and publicly disclose all material weaknesses.*  ¶ 42.

**C.    ICFR Weaknesses Were Material to GOL's Investors Given The Constantino Family's History of Illegal Practices**

The Constantino Family's history of illegal practices and GOL's history of ICFR violations made ICFR especially material to investors.  ¶ 62.  Constantino Family companies, including Comporte Partecipações SA, have been accused of bribing government officials.  ¶¶ 63-66.

5

In 2016—Operation Sepsis—focused on inflated highway construction contracts and bribery, targeted a Comporte Partecipações SA subsidiary and Henrique Constantino, who at the time was a director and shareholder of Comporte Partecipações SA, as well as a member of GOL's Board of Directors.  ¶¶ 67-68.  Henrique Constantino was indicted for allegedly paying bribes in exchange for loans from state-owned Caixa Economica Federal bank.  ¶ 69.  As a result, he resigned from the Board of GOL in July 2016.  *Id.*  On October 21, 2016, GOL announced that it had received earlier that year a request from Brazilian tax authorities in connection with an audit to furnish information regarding certain expenditures made by the Company in 2012 and 2013.  ¶ 70.  Later that year, GOL agreed to pay a $3.2 million fine and stated that it had engaged independent legal counsel to conduct an investigation.  *Id.*  In December 2016, Deloitte Touche Tohmatsu Auditores Independentes ("Deloitte") agreed to pay $8 million to the PCAOB to settle charges that it knowingly issued materially false audit reports for the 2010 financial statements and internal controls of GOL.  ¶¶ 71-72.

In August 2017, Lucio Funaro ("Funaro"), an accomplice of Eduardo Cunha ("Cunha") (former Brazilian Congressional speaker) signed a plea agreement in which he claimed that Henrique Constantino told him he needed to engage in bribery in order for Comporte Partecipações SA to survive.  ¶¶ 73-74.  In April 2019, Henrique Constantino signed a plea agreement admitting to illicit cash transfers to companies owned by Cunha in exchange for favorable treatment of Constantino Family companies, including GOL, and to other bribes at issue in "Operation Sepsis." ¶ 75.

### D.    Assessment of a Company's "Going Concern"

Auditing Standard No. 2415 ("AS No. 2415") required KPMG to assess GOL's ability to continue as a "going concern," (*i.e.* has sufficient near-term cash flow to meet debt payments on time and avoid a liquidation in bankruptcy (¶ 51)) and to disclose a "going concern" if it

6

determined that there is *substantial doubt* about the entity's ability to continue as a "going concern." ¶ 55. An auditor is required to make a going concern assessment as part of its audit of a company's financial statements. *Id.* Under International Accounting Standard ("IAS") No. 1, when management becomes aware of *material uncertainties* related to events or conditions that may cast *significant doubt* on the company's ability to continue as a going concern, those uncertainties must be disclosed in the financial statements. ¶ 52.

> **E.    Consistent With Auditing Standard No. 1301, GOL's Statutory Audit Committee Was Told of the Material Weaknesses in ICFR and the "Going Concern" Qualification as Early as February and Certainly No Later than May 2020—Much Earlier Than When Disclosed by Defendants**

> **1.    Overview of Auditing Standards and Timing**

Auditing a company's prior fiscal year's ICFR commences shortly after the beginning of the following year. ¶ 43. Accordingly, KPMG commenced its audit of GOL's 2019 financials in January 2020. *Id.* Because auditors initially focus on the adequacy or weakness of controls designed to prevent and to detect material misstatements in the financial statements, KPMG began its audit focused on GOL's ICFR. ¶¶ 43-44. Under IAS No. 1, GOL's management was also required to assess "going concern" *quarterly*. ¶¶ 51-52.

AS No. 1301 establishes requirements that enhance the relevance and timeliness of the communications between the auditor and the audit committee of the Board of Directors. ¶¶ 45-47. It is intended to foster constructive dialogue between the two on significant matters and requires auditors to "provide the audit committee with *timely* observations arising from the audit that are significant to the financial reporting process." (emphasis supplied). *Id.*

AS No. 1301 further states, all audit committee communications required by this standard should be made *"prior to the issuance of the auditor's report* and the appropriate timing" to the audit committee depends on factors such as the significance of the matters to be communicated.

7

¶ 48.  Auditing Standard No. 1305 ("AS No. 1305") states that, "the auditor must communicate in writing to management and the audit committee all significant deficiencies and material weaknesses identified during the audit and it should be made prior to the issuance of the auditor's report on the financial statements. ¶ 49.  A "material weakness" (as in this case) is *more* serious than a "significant deficiency," thus increasing the importance of prompt communication.  ¶ 50.

### 2.  KPMG Informed GOL of The Material Weaknesses and the Going Concern Early as February and Certainly No Later than May 2020

Since KPMG's audit began in January 2020 and (especially because KPMG was engaged in May 2019) and concentrated at the outset on the Company's controls for preventing material misstatements in the financial statements, KPMG became aware of the material weaknesses and the "going concern" qualification as early as February 2020 and no later than May 2020.  ¶ 102.

Since significant deficiencies and materials weaknesses—which are more consequential than significant deficiencies—have to be communicated in a timely manner and in writing (AS No. 1305), KPMG informed GOL's Statutory Audit Committee in writing and very early on in the audit process of the three material weaknesses.  ¶ 104.  Similarly, AS No. 2415 required KPMG to make a going concern assessment as part of its audit of a company's financial statements.  ¶ 55. Furthermore, because a "going concern" qualification is an observation "significant to the financial reporting process," KPMG also informed GOL's Statutory Audit Committee, early in its audit process, in writing, about the qualification.  ¶¶ 46-47.

Accordingly, consistent with AS No. 1301, KPMG was compelled to inform GOL's Statutory Audit Committee about the material ICFR weaknesses and the substantial doubt as to the Company's ability to continue as a "going concern," which were revealed *at the outset* of the year-end 2019 audit process.  ¶ 105.  As a result, GOL learned of its ineffective ICFR, the three

8

material weaknesses and the "going concern" qualification at least as early as February 2020 and certainly no later than May 2020. ¶ 106.

F.       **Defendants Issued Misleading Statements During The Class Period**

During the Class Period—in their 4Q 2019 Earnings Report, issued February 20, 2020, and the 1Q 2020 Earnings Report, issued May 2020—Defendants touted the strength of GOL's business. ¶¶ 82-90.  For example, Defendants touted GOL's "outstanding year in [] history (¶ 82) and said that they had the "necessary liquidity to weather the storm." ¶ 87.  In the MD&A, the Company touted its "effective balance sheet management," (¶ 83) and Defendant Lark said that GOL "continue[s] to strengthen the Company's equilibrium through disciplined working capital management and capital structure optimization," (¶ 84) and "[w]e have effective and structured liquidity management."  ¶ 88.  The Earnings Reports did not disclose any material weaknesses, nor a "going concern" qualification.

G.       **Disclosure of GOL's Fraud Caused its ADS Price to Fall, Damaging Investors**

On June 16, 2020, *months* after learning about KPMG's timely observations, GOL surprised investors by disclosing that KPMG had informed management and the audit committee that:  (i) its report on the Company's "internal control over financial reporting as of December 31, 2019 will probably include one or more material weaknesses" and (ii) its report on the Company's "consolidated financial statements as of and for the year ended December 31, 2019 will probably include an emphasis paragraph regarding the [Company's] ability to continue as a going concern." ¶ 91.

On June 29, 2020, on its Form 20-F with the SEC (the "2019 20-F"), GOL disclosed that (i) there was a  "substantial doubt" about the company's ability to continue as a "going concern;" (ii) there was a material weakness in internal controls over financial reporting ("ICFR") related to

9

general information technology controls ("GITCs") over operating systems, databases and applications, which had failed to prevent errors in measuring net income  and revenue for its "Smiles" frequent flyer loyalty program; and that (iii) there were material weaknesses in ICFR concerning:  (a)  identification and disclosure of material uncertainties in GOL's ability to operate as a  going concern; (b) the ability of the Company's Chairman, Defendant de Oliveira Jr., to initiate and approve transactions.  Defendants were duty bound, but failed to disclose these communications and material facts.  *¶¶* 91-99.  Both corrective disclosures caused the price of GOL's ADS to plummet to account for the fraud—the non-disclosure of the "going concern" qualification and the material weaknesses, in the Earnings Reports, while touting GOL's business strength.  *Id.*

> **H.**     **GOL Fires KPMG After the Ineffective ICFR and the "Going Concern" Qualification are Disclosed, Causing its ADS Price to Fall, Damaging Investors**

Indicative of Defendants' prior resistance to timely disclosure of KPMG's substantial doubts as to GOL's going concern status, material ICFR weaknesses and the Smiles net income and revenue error correction by KPMG, on July 6, 2020 (a mere week after KPMG had forced GOL to disclose these matters), KPMG was fired.  ¶ 13.  KPMG's firing was not disclosed until two weeks later by a press release issued by GOL on July 23, 2020.  ¶ 14.  On news of the firing, GOL's ADS stock price fell. ¶ 99.

GOL had *just* hired KPMG in May 2019. ¶ 115.  Prior to KPMG, GOL's auditor had been Ernst & Young ("E&Y"), and GOL maintained E&Y as its auditor for five years. ¶ 116. Prior to that, GOL's auditor was Deloitte, also for five years.  *Id.* Thus, GOL did not have a practice of rotating auditors on a yearly basis prior to firing KPMG.  Nor was GOL obligated to by the CVM, the Brazilian Securities and Exchange Commission. *Id.*  In fact, CVM Instruction No. 509/2011 permits companies that install and maintain a Statutory Audit Committee (unlike a regular audit

10

committee)—which GOL has, to hire an independent auditor to provide audit services *for up to ten consecutive years.* ¶ 117.  GOL proceeded to re-hire KPMG's immediate predecessor E&Y, which had consistently found that GOL maintained "effective internal controls over financial reporting." ¶ 119.

### III.    STANDARD ON MOTION TO DISMISS

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead a "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading.  *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).  In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is appropriate only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014). Thus, the Complaint need only contain sufficient facts "to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For the reasons below, Defendants' arguments are not persuasive, and the Amended Complaint should not be dismissed.

### IV.    ARGUMENT:  DEFENDANTS ISSUED MISLEADING STATEMENTS

#### A.    Statements Assuring Investors About GOL's Financial Strength Were Rendered Misleading Due To Their Failure To Disclose The "Going Concern" Qualification And The Three Material Weaknesses

"It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information" on the issue or topic. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258; *see Meyer,* 761 F.3d at 251; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir.

11

2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)). Ultimately, companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011).

### 1.    Going Concern Qualification

Because Defendants spoke on the topic of GOL's financial strength, they had the duty to disclose that the Company had received a "going concern" qualification from KPMG.  AS No. 2415 required KPMG to assess GOL's ability to continue as a "going concern," (*i.e.* has sufficient near-term cash flow to meet debt payments on time and avoid a liquidation in bankruptcy (¶ 51)) and to disclose a "going concern" if it determined that there is *substantial doubt* about the Company's ability to continue as a "going concern."  ¶ 55.  In accordance with AS No. 1301, because a "going concern" is an observation significant to the financial reporting process, KPMG told GOL about the "going concern" qualification early in its audit process, in a timely fashion—by at least February 2020 and certainly no later than May 2020—and in writing.  Defendants do not dispute, as they cannot, that a "going concern" qualification is material—investors would obviously find material the fact that there was substantial doubt about GOL's ability to pay its debt.  Instead, Defendants provide several arguments attempting to explain away why they were not obligated to disclose the qualification.  None is persuasive.

*First*, the cases cited by Defendants for the proposition that they were not required to disclose the "going concern" qualification are inapposite.  In *Berger* v. *Beletic*, 248 F. Supp. 2d 597, 603-604 (N.D. Tex. 2003) and in *In re CDNow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 636 (E.D. Pa. 2001), defendants did not make statements that were rendered misleading by their failure to disclose the "going concern" qualification.  Here, Plaintiffs do not argue that Defendants had an

12

independent duty to disclose the "going concern" qualification.  Rather, as detailed in the Amended Complaint (¶¶ 6-7, 82-90), Defendants issued a litany of statements attesting to the purported financial strength of the Company.  A duty to disclose all information relating to a particular subject arises by voluntarily "touting" the subject to investors.  *See SEC v. Merch. Cap. LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007).  Defendants made statements to investors that GOL had "effective and structured liquidity management" and that "[e]ven in the face of macroeconomic changes, we maintained our liquidity mix, which puts us in a strong position to face this crisis," while knowing that its auditor had observed that there was "substantial doubts about [GOL's] ability to continue as a going concern."  ¶ 94.  Because Defendants statements, without more, misled the public, they were under a duty to tell "the whole truth" relating to them, namely, the "going concern" qualification.  *In re Vivendi*, 838 F.3d at 258; *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1431 (3d Cir. 1997) ("[U]pdating might be required if a prior disclosure '[had] become materially misleading in light of subsequent events.")   "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969 (KM) (JBC), 2018 U.S. Dist. LEXIS 217963, at \*75 (D.N.J. Dec. 31, 2018).  Furthermore, courts have held that representations that a company is "financially solid," when such is not the case, can constitute actionable misrepresentations.  *See*, *e.g., In re Vivendi Universal S.A Litig.,* 381 F. Supp. 2d. 158, 182 (S.D.N.Y. 2003); *see also Hammer v. Frontier Fin. Corp.*, No. C10-0643, 2011 U.S. Dist. LEXIS 169245, \*13 (W.D. Wash. Sep. 7, 2011) ("But while Defendants may have been prohibited from disclosing a report that uncovered weak capitalization, they are *not free to knowingly make misleading public statements that contradict findings* in that report. The complaint does not fault Defendants for failing to

13

disclose the report—it *faults them for failing to disclose the practices identified in the report*. Defendants do not allege that they are prohibited from disclosing inadequate capitalization, liquidity, or weak loans.) (emphasis supplied).

*Second,* the Amended Complaint alleges well-pled facts showing *when* KPMG found out about the going concern and *when* it informed Defendants. Unlike in *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996)—where the court held that "[p]laintiffs alleg[ed] no circumstances to support their allegation," here, Plaintiffs have done so. As alleged in the Amended Complaint, KPGM was hired in May 2019, began its audit of GOL no later than January 2020. ¶¶ 43-44. AS No. 2415 required KPMG to disclose to GOL's Statutory Audit Committee its observation that there was substantial doubt about GOL's ability to continue as a "going concern." ¶ 55. A "going concern" is a significant finding, which Defendants do not dispute, and KPMG found out about the qualification early in its audit process, which begun no later than January 2020. AS No. 1301 required KPMG to provide GOL's Statutory Audit Committee with *timely and written observations* arising from the audit that are significant. ¶ 47. These communications are required *prior to the issuance* of the audit report on June 29, 2020. ¶ 48. Therefore, KPMG informed GOL's Statutory Audit Committee, in writing—as early as February 2020, but certainly no later than May 2020—about the "going concern" qualification. Defendants do not dispute the audit timeline, as described in the Amended Complaint. ¶¶ 42-57. Defendants also do not dispute the fact that KPMG *told* GOL of the "going concern" qualification before June—when the Company disclosed it, only that KPMG may not have *finally* "determined" the qualification before June 2020. Indeed, it is likely that GOL was informed of KPMG's "substantial doubts" much earlier than June. After all, GOL's competitor Avianca disclosed its going concern issue in April 2020, based on the determination by the same auditors, KPMG.

14

In any event, such distinction between being notified of substantial doubts by KPMG, and the auditor's "final determination" is of no import—the key issue is that Defendants *knew* about the "going concern" qualification before issuing the 4Q 2019 (in February 2020) and 1Q 2020 Earning Reports (in May 2020) and should therefore not have made upbeat statements about the Company's business if they did not want to disclose the qualification. Where a company does not have an obligation to speak but chooses to do so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002).

*Third,* Defendants misrepresent Plaintiffs' allegations. In arguing that the "going concern" qualification could not have been disclosed in the February 2020 4Q 2019 Earnings Report—because the COVID-19 pandemic had not yet impacted Brazil—Defendants, wrongly, state that Plaintiffs "concede" that the qualification was "driven" by the pandemic. Defs.' Br. at 14. Plaintiffs never alleged this and the cite by Defendants to the Amended Complaint (¶ 94) is a cite to a quote from KPMG's report disclosing the "going concern," but not directly attributing the "going concern" qualification to the COVID-19 pandemic. *Id.* With respect to GOL's May 2020 1Q 2020 Earnings Report, Defendants do not dispute that the effects of the COVID-19 pandemic were well-known by that time. Rather, they argue that because GOL was reporting on 1Q 2020 and "only two weeks of which was impacted by COVID-19" it could not have disclosed the qualification. Defs.' Br. at 14. This is no reason to fail to disclose the qualification it *knew* about. Indeed, by April 2020, its competitor in the region, Avianca, had already acknowledged that it had a "going concern" problem—also determined by KPMG. ¶¶ 107-108. Furthermore, some of the statements at issue (*see ¶¶* 83-84, 88) were made in the MD&A, which is understood to speak as of the time of the filing. ¶ 56. As such, any statements issued by GOL in 2020 regarding 2019

15

financial results and/or 1Q 2020 results, had to take into account *facts known* as of the dates those statements were issued.

*Fourth,* Defendants' argument that the fact that the Earnings Reports were silent on the subject of the KPMG audit means that they did not have to disclose the "going concern" qualification (Defs.' Br. at 14-15) misses the point. Defendants had a duty "to tell the whole truth" once they decided to speak about GOL's financial strength. *In re Vivendi*, 838 F.3d at 258.

### 2.       Material Weaknesses

Defendants' arguments as to why the material weaknesses did not need to be disclosed are also misplaced. *First,* for similar reasons as with the "going concern" qualification, when Defendants issued positive remarks about their business, they had an obligation to speak fully and disclose the material weaknesses. ICFR are essential to the integrity and reliability of financial results to investors. ¶ 7. Furthermore, the SEC has recognized that a company is obligated to publicly disclose all material weaknesses in ICFR. ¶ 42. Defendants do not dispute that the material weaknesses were material to investors. This is especially so with respect to the material weakness concerning ICFR related to the ability of the Company's Chairman, Defendant de Oliveira Jr., to initiate and approve transactions. The Constantino Family is the controlling shareholder, owning 61% of GOL. ¶ 33. Internal Controls to prevent the unwarranted intervention in the Company's financial matters were especially material to investors given the Constantino Family's history of corruption, as detailed in the Amended Complaint. ¶¶ 62-77. In fact, as a result of Henrique Constantino's bribery, on behalf of GOL (*see* ¶¶ 69, 75), GOL assured investors in its 2016 and 2018 20-Fs that it had taken steps to strengthen its internal controls. ¶¶ 78-81. *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) is inapposite. There, the court held that defendants did not have to disclose the financial controls problems before the next 10-Q report. *Id.* In other words, they did not have to rush to make an intra-quarter disclosure once

16

they were in possession of the information.    Here, Defendants were in possession of the information and made misleading statements in two quarter-filings before disclosing.

*Second,* for the same reasons as discussed *supra* at 6-9, 12, the Amended Complaint alleges well-pled facts showing when KPMG found out about the material weaknesses and informed Defendants.  Because internal controls are essential to the integrity and reliability of financial results to investors (¶ 35), in their review, auditors initially focus on the adequacy or weakness of controls designed to prevent and to detect material misstatements in the financial statements.  ¶ 44.  Accordingly, just as was the case with the "going concern" qualification, KPMG found out about weaknesses in ICFR early in its audit, which started in January 2020—latest, and informed GOL as early as February 2020, but certainly no later than May 2020.

*Third,* the fact that the material weakness related to GITCs concerning the Smiles program did not cause the financial statements to be misstated is irrelevant.  The material weakness caused GOL to under-recognize its liability for Smiles and over-recognize revenue.  ¶ 121. Smiles accounted for 52% and 32% of GOL's net income for 4Q 2019 and 1Q 2020, respectively. Investors would care and find material that there was a material weakness in GOL's process for revenue recognition even if no errors materialized.  Investors care about process.  *See, e.g., In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1329-30, 1341-44 (N.D. Ga. 2012) (finding that weaknesses in ICFR related to "lack of a formalized contract review process to ensure proper revenue recognition" were material to investors despite the fact that no financial figures were restated).

### 3.    The Statements Are Not Inactionable Puffery

Next, Defendants wrongly argue that the statements at issue are inactionable expressions of puffery or corporate optimism.  Defs.' Br. at 18.  For example, in 4Q 2019 Defendants touted GOL's "healthy margins due to strong cost control," "balance sheet strengthening," and its

17

"effective balance sheet management. . .operating cash flow generation around R$1.0 billion in the quarter." ¶¶ 6, 83.  In 1Q 2020, Defendants continued to issue upbeat statements despite knowing about KPMG's "going concern" qualification and material weaknesses.  For example, Defendants continued to tout GOL's "strong cost control and efficient capacity and yield management," emphasized how well it was managing its liquidity by stating that they had "the necessary liquidity to weather the storm," and stated, "[o]ur flexible fleet model has always been a differentiating strength for GOL." ¶¶ 7, 87.  Defendants' repeated statements assuring investors of GOL's strength cannot constitute inactionable puffery.  Statements that if "viewed in isolation, may be mere puffery" can "become material to investors" if "made repeatedly in an effort to reassure the investing public." *In re Signet Jewelers Ltd. Sec. Litig*., 2018 U.S. Dist. LEXIS 199809, at \*35 (S.D.N.Y. Nov. 26, 2018).  "General statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).  Defendants made repeated, specific and reassuring statements.  Defendants made statements that GOL was "acting with speed and decisiveness" and "reduced [] fixed costs to preserve the jobs of our Employees and the Company's working capital in the short term." ¶ 87.  "Puffery is an optimistic statement that is so vague, broad, and non specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012).  It is "vague (if not meaningless) management-speak." *In re Level 3 Communs. Sec. Litig.*, 667 F.3d 1131, 1340 (10th Cir. 2012).

Defendants also argue that statements, for example, that GOL "strengthen[ed] the Company's equilibrium" and was "acting with speed and decisiveness" to "reduce [its] fixed costs"

18

are inactionable "true statements." Defs.' Br. at 19. Defendants miss the point. "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013); *see Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (incomplete statements are misleading if they "affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists"); *see also Lapin v. Goldman Sachs Group, Inc.,* 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (plaintiffs sufficiently pled that defendants' multiple disclosures did not counterbalance defendants' misleading statements). Here, there can be no doubt that a reasonable investor would interpret Defendants' statements to mean that GOL had sufficient near-term cash flow and that there was not in fact "substantial doubts about its ability to continue as a going concern." ¶ 94.

The cases cited by Defendants are inapposite. In *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778 (S.D. Miss. 2002) and *Lasker* v. *N.Y. Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996), plaintiffs did not allege that the defendants were holding back specific information about the companies—that they knew and which was known at the time of the alleged misrepresentations—concerning the companies' financial viability. In *Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014), the court held the statements were "mere corporate optimism" because "'the market already knew' of the difficulties facing" the company. Here, investors were completely unaware of the "going concern" qualification. Finally, in *Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 211–12 (S.D.N.Y. 2020), the court found

19

statements of corporate optimism were inactionable because the plaintiff had not provided a factual basis to show why these statements were rendered misleading.  Here, the fact that there was *substantial doubt* that GOL could pay its short-term debt and continue as a "going concern" provides the factual basis for rendering statements that GOL had "effective and structured liquidity management," "maintained [its] liquidity mix" and had "the necessary liquidity to weather the storm," misleading.

### 4.    The Statements Are Neither Forward-Looking Nor Statements of Opinion

Defendants also argue that certain of the misstatements at issue are inactionable forward-looking statements protected by the "safe-harbor" provision. Defs.' Br. at 20.  Defendants argue that the statements, "We are, and will continue to be, an even stronger Company," "[b]y acting with speed and decisiveness, we have reduced our fixed costs. . . This will provide us with the necessary liquidity to weather the storm," and "[w]e have effective and structured liquidity management.  Even in the face of macroeconomic changes, we maintained our liquidity mix, which puts us in a strong position to face this crisis," are protected because they were "accompanied by meaningful cautionary language."  *Id.*  But such is not the case. To qualify as "meaningful," "cautionary language" "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement[s]." *Slayton v. Am. Exp. Co.,* 604 F.3d 758, 771 (2d Cir. 2010) (quoting H.R. Conf. Rep. 104-369, at 43 (1995)).  Language that is "vague" or "mere boilerplate" does not suffice.  *Id.* at 772.  "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.,*

20

36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).  Plaintiffs may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

The alleged "meaningful cautionary statements" here, located at the very end of both Earnings Reports at issue (*see* Defs.' Br. at 20 n. 13), were "vague" and "mere boilerplate."  For example, Defendants gave disclaimers that the statements at issue "reflect mere estimates and projections" "are based exclusively on the expectations of GOL's management" and "depend substantially on external factors. . ."  The alleged undisclosed risk—that GOL did not have sufficient near-term cash flow and that there was "substantial doubts about its ability to continue as a going concern,"—is not something a reasonable investor would have been alerted to, when reading such boilerplate disclaimers.  Thus, the statements at issue here are actionable because the alleged cautionary language "did not specifically reveal the particular risks allegedly known to" GOL. *In re MF Global Holdings*, 982 F. Supp. 2d 277, 315 (S.D.N.Y. 2013); *see Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.")[3]

Next, Defendants argue that certain of the statements at issue are opinion statements and actionable only if the speaker did not hold the belief professed.  Defs.' Br. at 21. However, statements of having "healthy margins," and "balance sheet strengthening," and of "continu[ing] to strengthen the Company's equilibrium through disciplined working capital management" are not opinions, but statements of current facts.  Even if they were opinions, any statement of opinion

---

[3] *In re Barrick Gold Sec. Litig.,* 341 F. Supp. 3d 358 (S.D.N.Y. 2018) and *In re SunEdison, Inc. Sec. Litig.,* 300 F. Supp. 3d 444, 483 (S.D.N.Y. 2018) are distinguishable because the cautionary statements there were meaningful.

21

can be misleading if "the speaker omits information whose omission makes the statement misleading to a reasonable investor" because "the omitted facts would conflict with what a reasonable investor would take from the statement itself." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). The statements were misleading due to their failure to disclose the "going concern" qualification.[4]

### V.    ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER

"[S]cienter can be established by alleging facts to show. . . strong circumstantial evidence of conscious misbehavior or recklessness." *ECA Loc. 134 IBEW Jt. Pension Tr. of Chicago,* 553 F.3d 187, 198 (2d Cir. 2009). Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care. . ..." *In re Carter-Wallace, Inc. Sec. Litig*., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). A strong inference of scienter exists where a complaint alleges that the defendants:   (1) "engaged in deliberately illegal behavior;" (2) "knew facts or had access to information suggesting that their public statements were not accurate;" or (3) "failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199. Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling

---

[4] *In re Leham Bros. Sec. & ERISA Litig.,* 799 F. Supp. 2d 258, 289 (S.D.N.Y. 2011) is inapposite. There, defendants made statements that the liquidity position was strong and sufficient to meet its expected needs over the next twelve months based on models and assumptions, some of which were disclosed in the offering materials, about what would happen in the future. Here, there were no such assumptions disclosed and Defendants were in possession of information that that they currently had a "going concern" and hence a liquidity problem.

as any opposing inference one could draw from the facts alleged." *Id*. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id*. at 331.

The Plaintiffs have clearly met this standard. Based on the normal process of how audits are conducted, *how* and *when* auditors communicate with a company's audit committee and senior officers and *what* they communicate to the them—during their audit (discussed *supra* at 6-9; *see also* ¶¶ 35-57, 100-106)—the Amended Complaint plausibly alleges that GOL and the Statutory Audit Committee were told about the "going concern" qualification and the material weaknesses as early as February 2020 and certainly no later than May 2020. Therefore, the Amended Complaint does contain well-plead facts that Defendants public statements "were inconsistent with their private knowledge." Defs' Br. at 22. The cases cited by Defendants are inapposite. Unlike in *Pollio* v. *MF Glob., Ltd.*, 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009), where defendants did not "identify. . . document. . . or information. . .in the possession of defendants," here, Plaintiffs identified that the information of the "going concern" qualification and the material weaknesses was conveyed to GOL's Statutory Audit Committee by KPMG. Unlike in *Johnson* v. *Siemens AG*, No. 09-cv-5310 (JG) (RER), 2011 U.S. Dist. LEXIS 35000, at *48 (E.D.N.Y. Mar. 31, 2011), Plaintiffs are not alleging that the Individual Defendants had knowledge "simply by virtue of their high-level positions," rather, they have pled in detail an audit process that establishes that Defendants were informed. Defendants also cite to *In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 663–64 (E.D. Va. 2012) and *Edgar* v. *Anadarko Petroleum Corp.*, No. H-17-1372, 2019 U.S. Dist. LEXIS 39977, at *44 (S.D. Tex. Mar. 13, 2019) for the proposition that an allegation that is "as likely as the nonculpable inference" is not actionable. Defs.' Br. at 23. Yet that is not the law. Rather, the allegations, to support an inference of scienter, must be "at least as compelling as any opposing inference"—not more so. *City of Birmingham Ret. & Relief Sys. v.*

23

*Credit Suisse Grp. AG,* No. 17 Civ. 10014, 2019 U.S. Dist. LEXIS 26962, at *23 (S.D.N.Y. Feb. 19, 2019). In fact, the allegations supporting the inference that Defendants were told about the "going concern" qualification and the material weaknesses by KPMG, in early 2020, is more "compelling" than the inference that KPMG never told Defendants about these until the day or days leading up to the disclosures. Such, would constitute an extreme departure from how an audit is supposed to be conducted. Defendants do not dispute the audit process as detailed in the Amended Complaint. ¶¶ 42-57.[5]

The fact that GOL fired KPMG on July 6, 2020—a mere week after issuance of the 2019 20-F—were the "going concern" qualification and the material weaknesses were disclosed, further supports scienter. ¶¶ 115. As detailed in the Amended Complaint, KPMG had only been GOL's auditor since May 2019. *Id.* Prior to KPMG, GOL had hired auditors for a five-year period. ¶ 116. GOL did not have a practice of switching auditors at the one-year mark, nor was GOL required to by Brazilian law. ¶¶ 116-17. It is quite clear that GOL purposely delayed disclosing the "going concern" qualification and the material weaknesses in the hopes of changing KPMG's determination. In fact, GOL had done just that in the past, when it forced its prior auditor, Deloitte, to sign off on GOL's improper write-down of unsupported deposits from prior periods. ¶¶ 71-72, 118. Deloitte was fined as a result of its acts. ¶ 71. KPMG, not wanting to share the fate of its predecessor, blew the whistle on GOL and the Company retaliated by firing KPMG and rehiring E&Y, its auditor from 2014 through 2019, which had stated every year that GOL maintained "effective internal controls over financial reporting." *See In re OCA, Inc. Sec. & Derivative Litig.*,

---

[5] Other cases cited by Defendants also miss the mark. Defs.' Br. at 23. Unlike in *Novak,* 216 F.3d at 309, *Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund* v. *Conseco, Inc.*, No. 09-cv-6966, 2011 LEXIS 34241, at *21 (S.D.N.Y. Mar. 30, 2011) and *Westchester Teamsters Pension Fund* v. *UBS AG*, 604 F. App'x 5, 8 (2d Cir. 2015), Plaintiffs do not allege that the "mere existence of material weaknesses" and/or "failure to identify problems" with "internal controls" constitutes scienter. Defs.' Br. at 23. Rather, it is the fact that Defendants *were told* by KPMG, *months prior*, and did not disclose it until KPMG forced their hand—that does.

24

No. 05-2165, 2006 U.S. Dist. LEXIS 90854, at *79 (E.D.La. Dec. 14, 2006) (a "[defendant's] history of dealing with its auditors contributes to the inference that [the] defendant[] [acted with scienter]"); *cf. Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 285 (D. Conn. 2005) (replacing an auditor who refuses to sign off on proposed accounting action is evidence of a strong inference of scienter).

Defendants next argue that if GOL was trying to hide KPMG's observations it would have "terminated its relationship with KPMG before filing the annual report." Defs.' Br. at 24. However, it is "at least as compelling" to infer that Defendants waited as long as they could, before firing KPMG, in the hopes of dissuading the auditor from disclosing its observations as final findings in its report. Furthermore, courts routinely consider terminations—after the alleged fraud is announced—as evidence of scienter. *See N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc*., 929 F. Supp. 2d 740, at 783-787 (M.D. Tenn. 2013) (firing of auditor after announcement of accounting errors formed part of holistic scienter analysis); *Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 U.S. Dist. LEXIS 75262, at *10-16 (N.D. Cal. May 17, 2017) (termination of CEO after revelation of the alleged fraud was indicative of scienter); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 (S.D.N.Y. 2006) (termination of executive after revelation of the alleged fraud formed part of holistic scienter analysis). KPMG's termination—after disclosure of the "going concern" qualification and the material weaknesses—coupled with the fact that KPMG had been GOL's auditor for just one year when GOL had a habit of keeping auditors for five-year rotations, is "'suspicious' or 'uncharacteristic' enough to support an inference of scienter that is at least as strong" as any opposing inference. *Hessefort v. Super Micro Comput., Inc.,* No. 18-cv-00838-JST, 2021 U.S. Dist. LEXIS 63629, at *27 (N.D. Cal. Mar. 29, 2021).

25

Moreover, on April 23, 2020, weeks before GOL issued its misleading May 4, 2020 1Q 2020 statements, Avianca, a Colombia airline whose auditor is also KPMG, filed a Form 6-K, stating that, KPMG had informed its audit committee that, KPMG's report for Avianca's year end 2019 would "include an explanatory paragraph indicating that substantial doubt exists as to our ability to continue as a going concern." ¶ 107.  Unlike GOL, Avianca did not fire KPMG as a result of the auditor's going concern emphasis. ¶ 108.  The fact that Avianca disclosed a "going concern" qualification *two* months before GOL did and *did not* fire KPMG after the disclosure is also indicative of scienter.  *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 905 (W.D. Tex. 2008) in inapposite. In *In re Dell Inc.,* one of the defendants was the auditor of the company.  *Id.* Plaintiffs referred to work performed by the auditor in other cases, which was alleged to be fraudulent, as supportive of scienter in the current matter.  *Id.*  The court declined to infer scienter because the work performed by the auditor in the other cases concerned *entirely different* companies than the one of the defendant company and of work performed in different *time periods*. *Id.*  Here, KPMG is not a defendant, GOL and Avianca are in the same industry and the work performed by KPMG (auditing of the companies) was performed in the same time period (early 2020).  An inference of scienter is appropriate when another company in the same industry, same market (South America), audited by the same firm and experiencing the same pressures due to the COVID-19 pandemic, was told and disclosed its "going concern" qualification in a timely manner, unlike Defendants.

Finally, for the same reasons discussed *supra* at 23-25, Plaintiffs have adequately pled scienter for the Individual Defendants.  Unlike Defendants' argument (Defs.' Br. at 26), Plaintiffs do not allege that Kakinoff and Lark had knowledge of the findings at issue, solely, "by virtue of

26

their senior positions."  Rather, they allege that they had knowledge because KPMG *told them* as soon as it found out, as a result of performing its audit—certainly no later than May 2020.[6]

## VI.    ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION

The third element of Plaintiffs' Section 10(b) claims, loss causation, "is not intended to impose a great burden on a plaintiff," as Plaintiffs need only meet Rule 8 notice pleading standards, which are met by "provid[ing] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind . . . ." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015)); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "Whether the truth comes out by way of a corrective disclosure describing the precise fraud . . . , or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi*, 838 F.3d at 262.   To establish loss causation, Plaintiffs must "demonstrat[e] that 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Id.* at 261 (2d Cir. 2016) (quoting *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis in *Vivendi*).

The Plaintiffs clearly met the loss causation standard.  Defendants argue that because GOL never addressed KPMG's 2019 audit findings during the Class Period, there was therefore no false or misleading statement that the disclosures corrected.  Defs.' Br. at 27.  However, "neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure to be a 'mirror image' tantamount to a confession of fraud." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, at 202 (S.D.N.Y. 2010).  "[A] corrective

---

[6] The cases cited by Defendants are distinguishable. Unlike in *Anderson* v. *Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1238 (10th Cir. 2016), *as amended* (July 6, 2016) where Defendants "failed to give adequate weight" to "red flags," here, there were actual adverse findings that Defendants failed to disclose while making rosy projections. *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, and ERISA Litig.*, 898 F. Supp. 2d 176, 183–84 & n.16 (D.D.C. 2012) is a decision on summary judgment where, unlike here, the record was fully developed, and the court still found no evidence of scienter.

disclosure need not be a 'mirror-image' disclosure—a direct admission that a previous statement is untrue." *Howard v. Liquidity Servs.*, 177 F. Supp. 3d 289, 315 (D.D.C. 2016).  Rather, it "must relate to the same subject matter as the alleged misrepresentation." *Id.*  Therefore, the appropriate inquiry is whether the "going concern" qualification and the material weaknesses—revealed by KPMG's audit, plausibly revealed to the market that GOL had liquidity problems.  When viewed holistically, KPMG's audit findings revealed the truth about GOL's liquidity problems, which GOL masked with its upbeat statements in February and May 2020.

Defendants also argue—and cite to various cases (Defs.' Br. at 27-28) for such proposition—that Plaintiffs failed to adequately plead loss causation because they failed to plead that the alleged misleading statements caused the losses, "as opposed to broader economic forces," namely, the COVID-19 pandemic. Yet this is simply not the case.  As alleged in the Amended Complaint (¶¶ 91-99), when GOL finally acknowledged that it had a "going concern" qualification as well as material weaknesses in its ICFR—well after its stock price had fallen as a result of the pandemic—the Company's stock fell significantly based on the news alone.  *See In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 398-99 (S.D.N.Y. 2012) (while defendants argued that the "plaintiff must allege facts disentangling the effect (if any) of the alleged corrective disclosures on [company's] stock price from the continuing marketwide decline," the court held, "plaintiff has alleged [company's] stock price fell significantly immediately following its corrective disclosures. These allegations *are sufficient at the pleading stage to allege loss causation*.) (emphasis supplied); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (same); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362-63 (S.D.N.Y. 2006) (same).

28

Courts in this Circuit have repeatedly noted that "where the question, at bottom, is one of intervening events—a consideration properly analyzed under *proximate cause*—'the chain of causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" (emphasis in original).  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) citing *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 174 (2d Cir. 2005); *see also In re Vivendi Universal, S.A. Sec. Litig*., 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (citations omitted) (noting that "causation is fundamentally a factual matter" that includes such factors as "the time between the event and the decline, the prominence of the fraud-related news relative to other news, [and] how new the information [w]as" to the market.")   In sum, "to hold that [P]laintiffs failed to plead loss causation solely because the [COVID-19 pandemic] occurred contemporaneously with [GOL's misrepresentations] would place too much weight on one single factor and would permit [Defendants] to blame the [COVID-19 pandemic] when their alleged conduct plausibly caused at least some proportion of [P]laintiffs' losses."  *King Cnty. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343-46 (S.D.N.Y. 2010).

## VII.   ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED SECONDARY VIOLATIONS

Because the Amended Complaint pleads a Section 10(b) claim, the Section 20(a) control person claim should stand. *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 284 (S.D.N.Y. 2012).

## VIII.   CONCLUSION

Defendants' motion to dismiss should be denied in its entirety. Alternatively, Plaintiffs request leave to amend the Amended Complaint, which "should be freely given" where, as here, amendment would not be futile.  *See Wilder v. News Corp.,* 2015 U.S. Dist. LEXIS 137158, at *48 (S.D.N.Y. Oct. 6, 2015).

Dated:  June 21, 2021                          Respectfully submitted,


                                               **POMERANTZ LLP**

                                               */s/ Jeremy A. Lieberman*
                                               Jeremy A. Lieberman
                                               Marc I. Gross
                                               Veronica V. Montenegro
                                               600 Third Avenue, 20th Floor
                                               New York, New York 10016
                                               Telephone: (212) 661-1100
                                               Facsimile: (212) 661-8665
                                               jalieberman@pomlaw.com
                                               mig@pomlaw.com
                                               vvmontenegro@pomlaw.com


                                               **POMERANTZ LLP**
                                               Patrick V. Dahlstrom
                                               10 South La Salle Street, Suite 3505
                                               Chicago, Illinois 60603
                                               Telephone: (312) 377-1181
                                               Facsimile: (312) 377-1184
                                               pdahlstrom@pomlaw.com


                                               **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
                                               Peretz Bronstein
                                               60 East 42nd Street, Suite 4600
                                               New York, New York 10165
                                               Telephone: (212) 697-6484
                                               Facsimile: (212) 697-7296
                                               peretz@bgandg.com

                                               *Attorneys for Plaintiffs*